******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DENNIS BERRIOS
## (AC 40043)

DiPentima, C. J., and Alvord and Lavery, Js.

*Syllabus*

Convicted of the crimes of manslaughter in the first degree, tampering with a witness, intimidating a witness and evasion of responsibility in the operation of a motor vehicle, the defendant appealed to this court. The victim, T, was killed when, while crossing a street with another individual, G, he was struck by a vehicle driven by the defendant. T was pulled under and dragged by the defendant's vehicle before one of its tires bounced on his head. The defendant then drove away at a high rate of speed. About one hour before the incident in which T was killed, the defendant had driven his vehicle, in the darkness with its headlights off, through an intersection without stopping at a stop sign, and then accelerated and swerved the vehicle toward T, G and M, who jumped onto a sidewalk to avoid being struck. The defendant had attempted to get money from his girlfriend, W, to buy a gun in the hours before T's death, when he angrily told W that he was going to hurt others. After the defendant was arrested but before trial, he sent crude text messages to W in which he insulted and threatened her. During trial, the defendant informed the court that he planned to pursue a defense of self-defense. The defendant claimed, inter alia, that during the incident in which T was killed, T and G had thrown rocks at his vehicle, and that he had driven off to protect himself because he assumed that his life was in danger. *Held*:

1. The defendant could not prevail on his claim that the evidence was insufficient to support his conviction of tampering with a witness and intimidating a witness because the state failed to prove that any threats he had made to W were intended to prevent W from testifying or to induce her to testify falsely; the jury reasonably could have concluded, in light of all the evidence up to the time that the defendant sent the text messages to W and the surrounding circumstances, that he intended to prevent W from testifying at his criminal trial, as the evidence showed that he sent W text messages in which he threatened her and stated that her decisions came with consequences and that she should choose between supporting him or T's family, and that, on the night of T's death, he attempted to obtain a gun and spoke to W about hurting others, which reasonably supported the jury's conclusion that the defendant wanted to prevent such evidence from being heard at his criminal trial.

2. The trial court did not abuse its discretion when it permitted S, a state medical examiner, to testify that the manner of T's death was homicide, which concerned an ultimate issue in the case, that conclusion having been based on S's medical knowledge, training and experience, and not solely or primarily on information she had received from the police investigation; S conducted the autopsy of T, documented his injuries, consulted with a neuropathologist about certain of those injuries and reviewed T's hospital medical records, and S's testimony that law enforcement and the Office of the Chief Medical Examiner cooperate to determine the manner of death was supported by the statute (§ 19a-407 [c]) that grants access to the Office of the Chief Medical Examiner to items in the custody of law enforcement.

3. The trial court did not abuse its discretion by admitting certain evidence of the defendant's prior misconduct, which consisted of testimony from W that the defendant had smashed car windows in his neighborhood and challenged her father to a fight, and evidence that he had thrown a bloody ice pack at a hospital employee while he was intoxicated and belligerent in the emergency department:

   a. The trial court did not abuse its discretion in determining that W's testimony about the defendant's smashing of car windows and his challenge to fight her father was admissible either as uncharged misconduct evidence or pursuant to the opening the door doctrine, as W's testimony was a proper means for the state to rehabilitate her credibility after the defendant on cross-examination had attempted to persuade the jury

that she was not credible; moreover, the trial court did not abuse its discretion in determining that the probative value of W's testimony about those incidents outweighed its prejudicial impact, as the evidence explained and put into context the actions and testimony of W, who was a significant witness for the state, it did not inflame the emotions of the jury, it involved conduct that was less shocking in nature than the defendant's alleged conduct in attempting to interfere with a witness or driving his motor vehicle into T and dragging T under the vehicle, and any prejudicial effect of W's testimony was lessened by the court's limiting instruction to the jury.

b. The trial court did not abuse its discretion in concluding that the defendant's testimony that he sent crude text messages to W only after he became depressed and started drinking heavily opened the door to other incidents in which he consumed alcohol and acted in such a manner, and the prejudicial impact of the evidence of his behavior at the hospital emergency department did not outweigh its probative value.

4. The defendant's claim that the trial court abused its discretion by admitting into evidence the vulgar text messages he had sent to W was unavailing; that court properly determined that the probative value of the text messages outweighed the prejudicial effect of the defendant's crude language, which defense counsel did not contemporaneously challenge, as the probative value of the text messages was high and the jury had heard an audio recording of a police interview with the defendant in which he used similar language.

5. The defendant could not prevail on his claim that the trial court improperly instructed the jury on the initial aggressor and provocation exceptions to his defense of self-defense, and improperly instructed the jury with respect to the retreat exception to the use of deadly physical force:

a. The jury reasonably could have concluded that the defendant was the initial aggressor and, thus, was not justified in using any physical force; the evidence showed that one hour prior to T's death, the defendant, with his vehicle's headlights off, revved the engine and swerved the vehicle toward T, G and M, which caused them to jump onto a sidewalk for safety, the defendant failed to provide authority holding that the passage of one hour rendered the initial aggressor exception inapplicable, and a reasonable jury could have concluded that the defendant had not communicated his withdrawal so as to nullify the initial aggressor exception to self-defense.

b. The evidence was adequate to warrant the court's jury instruction on the provocation exception to the defense of self-defense; the defendant's act of swerving his vehicle toward T, G and M was not indisputably a separate incident that foreclosed the jury from finding that it was done with the requisite intent for provocation, as the evidence before the jury showed that the defendant had targeted individuals for physical harm, that he had attempted to purchase a gun earlier on the day of T's death, and that he had sought revenge against those in his neighborhood who allegedly had harassed him.

c. Although the trial court improperly included an objective standard in its jury instruction on the retreat exception to the use of deadly physical force, the jury reasonably could not have been misled by the court's failure to properly convey the subjective standard of the duty to retreat; the defendant did not raise his self-defense claim until several days into the trial, the jury was required to resolve a credibility contest between inconsistent versions of the events at issue, as the defendant's self-defense claim was established through his testimony and interview with the police, whereas the state presented evidence that he intentionally hit T with his vehicle, and neither party presented much evidence as to the retreat exception or discussed it in detail.

Argued September 12, 2018—officially released February 5, 2019

*Procedural History*

Substitute information, in the first case, charging the defendant with two counts of the crime of manslaughter in the first degree, one count of the crime of murder, and with the commission of a felony while on release and the commission of an offense while on release, and substitute information, in the second case, charging the defendant with the crimes of tampering with a witness

and intimidating a witness, and substitute information, in the third case, charging the defendant with the crime of evasion of responsibility in the operation of a motor vehicle, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated; thereafter, the court, *Kahn*, *J.*, granted the defendant's motion to dismiss the charge of having committed an offense while on release; subsequently, the matter was tried to the jury; thereafter, the court denied the defendant's motions to preclude certain evidence, and for a judgment of acquittal as to the charges of tampering with a witness and intimidating a witness; verdicts and judgments of guilty of one count of manslaughter in the first degree, and tampering with a witness, intimidating a witness and evasion of responsibility in the operation of a motor vehicle, from which the defendant appealed to this court. *Affirmed*.

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *C. Robert Satti, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Dennis Berrios, appeals from the judgments of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), tampering with a witness in violation of General Statutes § 53a-151 (a), intimidating a witness in violation of General Statutes § 53a-151a (A) (1) and evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (a).[1] On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction of tampering with a witness and intimidating a witness, (2) the trial court improperly permitted certain testimony from a state medical examiner, (3) the court abused its discretion in admitting certain prior misconduct evidence, (4) the court abused its discretion in admitting into evidence crude text messages sent by the defendant and (5) the court improperly instructed the jury with respect to self-defense. We disagree and, accordingly, affirm the judgments of conviction.

The jury reasonably could have found the following facts. On August 9, 2014, Wilma Figueroa (Wilma) spent time with the defendant, her boyfriend, at his home on Park Street in Bridgeport. While in his kitchen after 7 p.m., the defendant angrily told Wilma that "the only thing he wanted for his [upcoming] birthday was to make everyone pay." He continued by stating that he had "unfinished business," that he was going to "hurt others" and that "there was going to be bloodshed." The defendant identified Wilma's brother, William Figueroa (William), as one of his targets. The defendant further stated that he needed money to purchase a gun from his cousin in Hartford and that he would use it to kill William.

Wilma went with the defendant to an automated teller machine, but purposefully entered an incorrect code to "lock out" the bank card and prevent the defendant from getting cash to buy the gun. After returning to the defendant's home, Wilma and her son departed at about 9 p.m.

Shortly thereafter, Justin Griffin walked from his residence to the home of the victim, Tyron Tate. Griffin saw a black Chevy Avalanche[2] with its headlights off proceed through the intersection at William Street and Arctic Street without stopping at a stop sign, even though it was dark outside. Another witness, Michael Shuler, claimed that he was with Griffin and the victim when the defendant drove past the stop sign, "hit the gas and swerved towards [them while driving the Avalanche], and [they] jumped on the sidewalk."[3]

Approximately thirty minutes later, Griffin and the victim were walking to a corner store in the vicinity of Noble Avenue and Jane Street. While crossing the

intersection, Griffin, who was talking or texting on his phone, walked in front of the victim. The victim shoved Griffin forward while shouting, "there's [the defendant]." While being pushed, Griffin looked to the left and saw a vehicle that had "just popped out of nowhere right there and had hit [the victim]." Shuler, who also was present, observed the defendant "hit the gas" and drive toward Griffin. Shuler also saw the Avalanche hit and drag the victim. Another witness to the incident, Jonathan Santos, observed the Avalanche depart in the wrong lane of travel at a high rate of speed.

The victim, after being struck by the Avalanche, was pulled under the front of the vehicle. Griffin chased after the vehicle as the victim was trapped underneath. Griffin observed the victim "stuck" under the Avalanche, which was "bouncing up and down on him." Eventually, the front tire on the driver's side of the Avalanche "bounc[ed]" on the victim's head, and his body was freed as the vehicle was driven away. As Griffin approached the victim, he observed a significant blood loss from the head and face, as well as other injuries.

As Shuler ran toward the home of the victim's mother, he noticed that the Avalanche had returned to the area of Jane Street and Noble Avenue. The driver's side window had been lowered, and Shuler identified the defendant as the operator of the vehicle. Shuler also stated that the defendant might have "laughed or something."

Anthony Caiazzo, a Bridgeport police officer, received a dispatch at approximately 10 p.m., and was directed to Noble Avenue between Arctic Street and Jane Street. Upon Caiazzo's arrival, he observed the victim on the ground receiving medical aid. Paramedics transported the victim to Bridgeport Hospital, where he died from his injuries.[4] Caiazzo retrieved a surveillance video from a store located on the corner of Arctic Street and Noble Avenue.

The next morning, on August 10, 2014, Bridgeport police officers located the Avalanche and detained the defendant at his home. The defendant invited the officers into his home where he was interviewed by the officers, who audio recorded the interview. The defendant initially claimed to have left Bridgeport in the Avalanche at about 6:30 or 7 p.m. on August 9, 2014, to visit his brother in Dayville. The defendant then stated that he had returned to his Bridgeport home moments before the police officers detained him. Upon further questioning, the defendant again stated that he was at his brother's residence in Dayville and not in Bridgeport at the time of the incident involving the victim.

The police informed the defendant of the existence of a video recording of his Avalanche in Bridgeport the prior night. The defendant's initial response was that

the video must have been recorded earlier that evening, but he eventually acknowledged that the Avalanche was in Bridgeport at the time the victim was hit. The police then questioned the defendant regarding certain damage[5] to the Avalanche. At first, the defendant claimed that the damage had occurred in April, 2014, but subsequently stated that "two people [had thrown] rocks at his vehicle at the corner of Noble [Avenue] and Jane [Street] that night before." The defendant eventually acknowledged that he had hit the victim with the Avalanche on August 9, 2014. At the conclusion of this interview, the police arrested the defendant.

The police interviewed Wilma on August 21, 2014. At that time, she did not discuss the verbal threats made by the defendant on August 9, 2014. During the next few months, the relationship between the defendant and Wilma waned, and they stopped being intimate in October, 2014. In the middle of January, 2015, the defendant sent her text messages that caused her to contact the police. The defendant texted Wilma a warning that she should "[c]hoose wisely," that the victim's mother had performed oral sex on him during the relationship, that his attorney was going to "rip [you all] a new [a]sshole," that she was going to find out what the defendant was "[a]bout," that "[d]ecisions come with consequences," that he hated her because she abandoned him, that she played "both sides of the fence" and would "pay [for her] betrayal," and that he was standing on her "corner . . . ." These text messages frightened Wilma. A police detective conducted a second interview with her on January 23, 2015.

The state charged the defendant in three separate informations. The informations were consolidated for trial, which occurred over several days in October, 2016. The jury found the defendant guilty of manslaughter in the first degree, tampering with a witness (Wilma), intimidating a witness (Wilma) and evasion of responsibility in the operation of a motor vehicle. The court accepted the verdicts and, on December 9, 2016, sentenced the defendant to twenty years incarceration for the manslaughter conviction, ten years incarceration, execution suspended after five years for the evasion of responsibility conviction, ten years incarceration, execution suspended after five years for the intimidating a witness conviction and ten years incarceration for the tampering with a witness conviction. The sentences for the evasion of responsibility and intimidating a witness counts were to run consecutively to the sentence for the manslaughter count; the sentence for tampering with a witness was to run concurrently with the other counts. Thus, the defendant's total effective sentence was forty years incarceration, execution suspended after thirty years, and five years probation with certain conditions. This appeal followed. Additional facts will be set forth as needed.

## I

The defendant first claims that there was insufficient evidence to support his conviction of tampering with a witness and intimidating a witness. Specifically, he argues that his conviction for these two crimes "must be vacated because the state failed to prove that any threats [he] made were intended to prevent or affect [Wilma's] testimony. The texts show that [the] defendant was infuriated with her because she had been supporting [the victim's] family and aligning herself with her brother behind his back. The threats were made because of her betrayal and were not about any future testimony she might give." The state counters that the evidence was sufficient to support the finding that the defendant's threats "were not simply rants motivated by anger over her perceived betrayal and disloyalty, but were intended to influence or prevent any testimony that she might give against him at a criminal trial." We agree with the state.

As an initial matter, we set forth our standard of review and relevant legal principles. "A defendant who asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Reed*, 176 Conn. App. 537, 545, 169 A.3d 326, cert. denied, 327 Conn. 974, 174 A.3d 194 (2017); *State* v. *Leandry*, 161 Conn. App. 379, 383, 127 A.3d 1115, cert. denied, 320 Conn. 912, 128 A.3d 955 (2015). "The standard of review [that] we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [fact finder's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . [I]n [our] process of review, it does not diminish the proba-

tive force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Seeley*, 326 Conn. 65, 72–73, 161 A.3d 1278 (2017); see *State* v. *Dubuisson*, 183 Conn. App. 62, 68–69, 191 A.3d 229, cert. denied, 330 Conn. 914, 193 A.3d 560 (2018). Simply stated, "[o]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Chemlen*, 165 Conn. App. 791, 817, 140 A.3d 347, cert. denied, 322 Conn. 908, 140 A.3d 977 (2016).

Next, we turn to the relevant statutory language for §§ 53a-151 and 53a-151a. See, e.g., *State* v. *Pommer*, 110 Conn. App. 608, 613, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008). Section 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." Simply stated, "liability under § 53a-151 hinges on the mental state of the perpetrator in engaging in the conduct at issue—his intent to induce a witness to testify falsely [or withhold testimony, elude legal process or absent himself or herself from the proceeding]—not on whether he must overcome by coercive means the will of a witness reluctant to do so." *State* v. *Coleman*, 83 Conn. App. 672, 678, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005); see also *State* v. *Ortiz*, 312 Conn. 551, 562–63, 93 A.3d 1128 (2014); *State* v. *Cavallo*, 200 Conn. 664, 668–72, 513 A.2d 646 (1986); *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 59, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004).

Section 53a-151a (a) provides: "A person is guilty of intimidating a witness when, believing that an official proceeding is pending or about to be instituted, such person uses, attempts to use or threatens the use of physical force against a witness or another person with intent to (1) influence, delay or prevent the testimony of the witness in the official proceeding, or (2) induce the witness to testify falsely, withhold testimony, elude legal process summoning the witness to testify or absent himself or herself from the official proceeding." Our Supreme Court has stated that "[i]n light of the close relationship between §§ 53a-151 (a) and 53a-151a (a), it is appropriate to give the same phrase in each statute the same meaning." *State* v. *Sabato*, 321 Conn. 729, 747, 138 A.3d 895 (2016).

The following additional facts are necessary for our discussion. The defendant and Wilma began dating in late 2011. On August 9, 2014, she was with the defendant until approximately 9 p.m. She did not learn of the victim's death until the next morning. On August 21, 2014, when she spoke with a police detective, Heitor Teixeira, she did not reveal the threats made by the defendant, or his desire and efforts to obtain a gun on the night of the incident. She also agreed with the prosecutor's statement that the defendant "seemed just fine" on that date. She subsequently informed the defendant of this police interview.

After the incident but prior to the end of their relationship, Wilma, who knew that the defendant had been arrested and released on bail, made efforts not to be seen with him. Wilma saw the defendant only about three or four times after August, 2014. In January, 2015, Wilma attended court proceedings to support the mother of the victim.

In mid-January, 2015, over the course of several days, the defendant sent Wilma a number of text messages, which were entered into evidence. In the text messages sent on January 14, 2015, the defendant expressed regret and sorrow over the end of their relationship.[6] Two days later, however, the content and tenor of the text messages abruptly changed into insults and threats.[7] Wilma did not respond to these texts; instead, she met with Teixeira on January 23, 2015.

On appeal, the defendant challenges only the intent element of the tampering with a witness and intimidating a witness charges.[8] "[D]irect evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . [A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Robert S.*, 179 Conn. App. 831, 836, 181 A.3d 568, cert. denied, 328 Conn. 933, 183 A.3d 1174 (2018); see also *State* v. *Griffin*, 184 Conn. App. 595, 615–16, 195 A.3d 723, cert. denied, 330 Conn. 941, 195 A.3d 692, 693 (2018); *State* v. *O'Donnell*, 174 Conn. App. 675, 687–88, 166 A.3d 646, cert. denied, 327 Conn. 956, 172 A.3d 205 (2017). "For example, intent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances. . . . [W]hen a jury evaluates evidence of a defendant's intent, it properly rel[ies] on its common sense, experience and knowledge of human nature in drawing inferences and reaching conclusions of fact." (Internal quotation marks omitted.) *State* v. *Williams*, 172 Conn. App. 820, 828, 162 A.3d 84, cert. denied, 326

Conn. 913, 173 A.3d 389 (2017). Additionally, "it is a permissible, albeit not a necessary or mandatory, inference that a defendant *intended the natural consequences of his voluntary conduct.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Bennett-Gibson*, supra, 84 Conn. App. 53.

The defendant argues that his "text messages had nothing to do with any trial testimony Wilma might have given. Rather, the threats pertained to her past action of siding with [the victim's] family and her brother. The most that can be gleaned from the texts was that he was threatening retaliation for her betrayal. There simply is no indication that he was threatening her to prevent her from testifying." This interpretation of evidence represents a conclusion that *could* have been reached by the fact finder. Nevertheless, a reasonable jury, in considering all of the evidence up to the time the defendant sent the text messages to Wilma and the surrounding circumstances, also could have inferred that he had intended to prevent her from testifying at his criminal trial. Thus, mindful of our limited review; see *State* v. *Bush*, 325 Conn. 272, 304, 157 A.3d 586 (2017) (reviewing court does not sit as thirteenth juror); the defendant's sufficiency claim must fail.

The defendant sent the text messages to Wilma in the time period after his arrest, but prior to his criminal trial. Additionally, Wilma, following the end of her romantic relationship with the defendant, had attended court proceedings and supported the victim's mother. The defendant twice told Wilma to "[c]hoose wisely" and that the victim's mother would not "be around" at the conclusion of the proceedings. He referred to the upcoming legal proceedings when he cautioned Wilma that his attorney would "rip . . . y'all a new [a]sshole . . . ." The defendant further stated that Wilma was being "us[ed]" and that her decisions came with consequences. He then accused Wilma of "playing both sides of the fence" and that stated she had betrayed him, despite his loyalty to her. Finally, he threatened her by proclaiming that he was "standing on [her] corner . . . ."

Without resorting to speculation or conjecture, the jury reasonably could have inferred that the defendant intended to affect Wilma's testimony in violation of §§ 53a-151 (a) and 53a-151a (a). The state presented evidence that the defendant, by telling Wilma to choose between supporting him or the victim's family, by referencing their past romantic relationship and his loyalty to her, and by threatening and insulting her, sought either to prevent her from testifying or to induce her to testify falsely. Moreover, on the night of the victim's death, the defendant had spoken with Wilma about "hurting others" and had attempted to obtain a gun. The jury reasonably could have concluded that the defendant wanted to prevent such evidence from being

heard at his criminal trial. We conclude, therefore, that there was evidence supporting the jury's conclusion that he had the requisite mental state to violate §§ 53a-151 (a) and 53a-151a (a).[9] Accordingly, we conclude that his claim of evidentiary insufficiency must fail.

## II

The defendant next claims that the court improperly permitted certain testimony from the medical examiner. Specifically, he argues that the court erred by allowing the medical examiner to testify that the manner of death in this case was homicide because this conclusion was not based on her medical expertise, but on information she had received from the police. The state counters that the court did not abuse its discretion in permitting such testimony and that certain aspects of the defendant's claim are not properly before this court. We agree with the state.

The following additional facts are necessary for our discussion. The defendant filed a motion in limine dated October 17, 2016, seeking to preclude certain testimony from Susan Williams, a pathologist in the Office of the Chief Medical Examiner, who had performed the August 11, 2014 autopsy of the victim. The defendant argued that on the date of the autopsy, Williams listed the manner of death as "[c]ircumstances pending further investigation." On December 24, 2014, she amended the manner of death to homicide. The defendant contended that this amendment was based not on Williams' medical expertise but on the completion of the police investigation, and, therefore, the jury would not need her testimony on the manner of the victim's death, which was an ultimate issue in the case.

On October 18, 2016, the court heard argument on the defendant's motion in limine outside of the presence of the jury. Defense counsel argued that Williams' determination as to the manner of death was not based on her medical expertise, and therefore her testimony would not assist the jury. The state responded that defense counsel had "gloss[ed] over" the portion of § 7-3 of the Connecticut Code of Evidence, which provides that "an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." The state also noted that the medical examiner's office had a statutory duty to investigate the victim's death,[10] and to issue a report[11] and a death certificate.[12] The state further represented to the court that the report from the medical examiner's office must classify the manner and cause of death as (1) unable to determine, (2) accidental, (3) suicide, (4) natural or (5) homicide. After further argument, defense counsel again claimed that Williams had amended her classification to homicide on the basis of the police investigation, and not her medical expertise. Therefore, her testimony was not necessary to explain the cause of death to the jury.

The court denied the motion in limine. It reasoned that Williams had a statutory obligation to identify the cause and the manner of death,[13] and that defense counsel could cross-examine Williams as to whether her ultimate conclusion of homicide was based on the police investigation. It also determined that the objection went to the weight, and not the admissibility, of Williams' testimony.

Williams testified later that day. At the outset of her testimony, Williams indicated that she was board certified in, inter alia, forensic pathology, which is the medical specialty of determining the cause and manner of death. She stated that the victim had died from his brain injuries and that the manner of death was homicide.

During cross-examination, Williams testified that she had a statutory obligation to provide both the cause of death and the manner of death. Defense counsel posed the following question to Williams: "And when you did the autopsy on August 11, 2014, what was the manner of death that you had concluded at that point in time?" Williams responded: "So, when the investigation is still ongoing, we say circumstances pending further investigation. . . . And that's what I did in this case." Williams further explained that when a pedestrian is struck by a motor vehicle, it could be an accident, or a suicide or a homicide, depending on the particular facts and circumstances of each particular incident. Williams stated that the information she received from the police investigation assisted with her decision to classify the manner of death as a homicide. On redirect examination, Williams noted that, similar to a motor vehicle incident, the manner of death from a single gunshot could be a homicide, a suicide or an accident. Williams further explained that pathologists would consider the context of the events, as obtained by the police, to assist in the determination of the manner of death.

We begin by setting forth our standard of review and the relevant legal principles. "We review a trial court's decision [regarding the admission of] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Although we afford trial courts significant discretion, [w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]. . . . To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing

party. . . .

"We also note our standards for admitting expert testimony. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 123–24, 156 A.3d 506 (2017); see also *State* v. *Beavers*, 290 Conn. 386, 414, 963 A.2d 956 (2009); *State* v. *Rivera*, 169 Conn. App. 343, 368, 150 A.3d 244 (2016), cert. denied, 324 Conn. 905, 152 A.3d 544 (2017); see generally Conn. Code Evid. § 7-2.

On appeal, the defendant argues that Williams testified regarding the ultimate issue in the case, that is, whether the defendant intentionally hit the victim with the Avalanche or had done so accidently. "By testifying that the death was a homicide, the expert [Williams] gave her opinion that the state's version of events was correct without basing it on any expertise or specialized knowledge." He then directs us to § 7-3 (a) of the Connecticut Code of Evidence, which provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." Put a different way, the defendant contends that because Williams' testimony was not based on her medical knowledge and training, but on information obtained from the police investigation, her testimony regarding the manner of the victim's death did not provide the jury with expert assistance with respect to that issue. Thus, he argues that the general rule regarding the inadmissibility of testimony that embraced the ultimate issue applied, and the testimony should not have been permitted. In support of this argument, the defendant cites out-of-state authority.[14] He further contends that he was harmed as a result of this evidentiary impropriety. We are not persuaded.

Section 7-3 of the Connecticut Code of Evidence adopted the common-law rule that a witness' opinion on an ultimate issue in the case is inadmissible. *State* v. *Finan*, 275 Conn. 60, 66, 881 A.2d 187 (2005); see also C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 7.17.2, pp. 486–87. "The common-law rule protects the defendant's right to have the jury determine his guilt or innocence." *State* v. *Finan*, supra, 66. The ultimate issue in a case is one that "cannot reasonably be separated from the essence of the matter to be decided [by the trier of fact]." (Internal quotation marks

omitted.) Id.; see also *State* v. *Favoccia*, 306 Conn. 770, 786, 51 A.3d 1002 (2012).

Our law recognizes, however, that "[e]xperts can sometimes give an opinion on an ultimate issue if the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." C. Tait & E. Prescott, supra, § 7.17.3, p. 487; see also Conn. Code Evid. § 7-3 (a) ("an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue"); *State* v. *Taylor G.*, 315 Conn. 734, 761, 110 A.3d 338 (2015); *State* v. *Lamme*, 19 Conn. App. 594, 603, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990). In the present case, the defendant does not challenge, as a general matter, the propriety of Williams' expert testimony. Instead, the defendant contends that her opinion was improper, under these facts and circumstances, because it was not based on her medical expertise, but rather on information she had received from the police investigation. Put differently, the defendant claims that because Williams relied primarily on police information, and not on her medical expertise in reaching her conclusion that the manner of death was a homicide, this testimony was not that of an expert and thus inadmissible.

The defendant acknowledges that there are no Connecticut cases to support his claim, and relies on out-of-state authority. For example, he directs us to *State* v. *Jamerson*, 153 N.J. 318, 324, 708 A.2d 1183 (1998), where the defendant, Charles L. Jamerson, was convicted of reckless manslaughter, in part on the basis of his having operated a motor vehicle while under the influence of alcohol. His strategy at trial was to show that his conduct did not amount to recklessness and that the victims' vehicle had failed to stop at a stop sign. Id. "The [s]tate introduced testimony through a county medical examiner that [Jamerson] was operating his vehicle in a reckless manner at the time it collided with the decedent's vehicle." Id.

At the trial, the medical examiner, Claus Speth, was qualified as a forensic pathologist, but not as an accident reconstructionist. Id., 330. Nevertheless, Speth considered the facts and witnesses' statements to conclude that Jamerson had caused the accident and had driven under the influence of alcohol. Id. Speth also determined, on the basis of witness statements and his own personal observations, that there was no evidence that the victims " 'had violated the stop sign,' " and that Jamerson had operated his vehicle in violation of numerous traffic laws. Id., 331–32. Finally, Speth personally interviewed a witness to the accident and concluded that from her vantage point, she could not have observed the stop sign that she claimed the victims had failed to observe. Id., 333.

The New Jersey Supreme Court concluded that Speth

had been qualified only as an expert in forensic pathology and, therefore, should not have been permitted to testify as to matters that would be within the purview of an accident reconstructionist. Id., 338–39. Additionally, under these facts, the circumstances of the accident were within the understanding of an average juror, and, thus, expert testimony was improper. Id., 340–41. Finally, Speth improperly commented on the credibility of another witness. Id., 341.

The defendant also refers us to cases from other jurisdictions that have established a general rule that the opinion of a medical examiner is inadmissible when the medical examiner relies primarily or largely on the testimony of fact witnesses, such as police officers, rather than on his or her medical knowledge, to reach an opinion as to the manner of death. See, e.g., *State* v. *Sosnowicz*, 229 Ariz. 90, 95, 270 P.3d 917 (App. 2012) (medical examiner's opinion that manner of death was homicide and not accident was based on circumstances as reported to him by police and not on his specialized medical knowledge); *State* v. *Tyler*, 867 N.W.2d 136, 156 (Iowa 2015) (where medical examiner is too reliant on witness statement or information obtained through police investigation in forming opinions on cause or manner of death, such opinions may not assist trier of fact); *State* v. *Vining*, 645 A.2d 20, 20–21 (Me. 1994) (medical examiner's opinion of homicide was not product of her expertise and was based solely on her discussions with police investigators and thus amounted to assessment of credibility and investigatory acumen of police).

The present case is distinguishable from the sibling authority cited in the defendant's brief. At the outset, we note that General Statutes § 19a-407 (c) specifically grants access to the Office of the Chief Medical Examiner to any object, writings or other articles of property in the custody of any law enforcement office when such items may be useful in determining the manner of death.[15] Upon such a request, such law enforcement officials shall deliver the items and any reports of the analysis of such items by law enforcement. See General Statutes § 19a-407 (c). Thus, our statutes clearly contemplate and support Williams' testimony that cooperation and coordination between law enforcement and the Office of the Chief Medical Examiner occur to determine the manner of death.

Next, the facts and circumstances of the present case support a conclusion that Williams' determination of the victim's manner of death was based on her medical knowledge and expertise, and not solely or primarily on the police reports. Williams conducted the autopsy of the victim on August 11, 2014. She documented the injuries suffered by the victim, including abrasions to the left side of the head, forehead and left lower back, bruising on the left lower back and left flank, skull

fractures, subarachnoid hemorrhage, signs of brain injury, skin lacerations, and numerous fractures of both scapula, the neck, lumbar vertebrae and the left femur. Williams consulted with Dean Uphoff, a neuropathologist, regarding the injuries to the victim's brain, and reviewed the victim's medical records from the hospital regarding the efforts to save his life. It is clear, therefore, that Williams' ultimate conclusion as to the manner of death was not made solely or largely on the basis of the police reports, but rather on her medical knowledge, training and experience.[16] These facts stand in stark contrast to those set forth in *State* v. *Jamerson*, supra, 153 N.J. 318. Accordingly, we conclude that the court did not abuse its discretion in denying the motion in limine and permitting Williams to testify as to the manner of death.

### III

Next, the defendant claims that the court abused its discretion in admitting certain prior misconduct evidence. Specifically, the defendant argues that the court improperly admitted evidence that he (1) had damaged cars in his neighborhood, (2) had challenged Wilma's father to a physical fight and (3) while intoxicated, had thrown a bloody ice pack at hospital staff.[17] The defendant contends that this evidence was irrelevant, and that its prejudicial impact outweighed its probative value such that he was harmed, thereby necessitating a new trial. The state counters that the court did not abuse its discretion in admitting the challenged evidence and that, in any event, such error was harmless. We agree with the state that the court's evidentiary rulings did not constitute an abuse of discretion.

The following additional facts are necessary for our review of this claim. During her direct examination, Wilma testified that on the evening of August 9, 2014, the defendant made threatening statements against various individuals, including her brother, William. During cross-examination, she indicated that during her January 23, 2015 interview with Detective Teixeira, she stated that the defendant had threatened to kill her and her father in addition to her brother and another individual. She then explained that she had continued her physical relationship with the defendant, despite his verbal threats, until October, 2014, to protect herself, her brother and her father.[18]

Prior to its redirect examination, the state made a proffer as to certain misconduct evidence. Outside of the presence of the jury, Wilma stated that, in May, 2014, the defendant said that "he was going to get even for everything," and had challenged her father to a physical fight. Second, Wilma testified that, in November, 2013, the defendant had used a baseball bat to damage vehicles around Wilma's house because he lost his wallet containing recently collected rent money. Third, she indicated that, prior to August 9, 2014, the defendant

had threatened her five or six times when he was angry. Finally, she stated that she did not go to the police after hearing his August 9, 2014 threats because she "thought . . . he would forget about it in the morning."

Defense counsel argued that breaking car windows in November, 2013, was not relevant evidence. The state claimed that during cross-examination, Wilma's "motives and reason" were raised, and, therefore, the incidents of the defendant's prior misconduct were "highly probative and relevant."

The court then ruled: "All right. My ruling is that, based on what I've heard from the proffer, while certainly the fact that he damaged windows of people's cars in the neighborhood, and that he had threatened her father, agreed to—wanted to fight him, and her knowledge of his temper all are probative of the issue which defense opened up on cross-examination, the entire cross-examination was designed to make this witness appear to be lying about the threats the defendant made on August 9th and what she observed on August 9th as a fabrication after the fact. She was specifically asked and pointed to her testimony—her statements as to Detective Teixeira about she didn't know anything, and if she could make up a story, and her reasons for not being up front with police. And she was questioned extensively about what she told the police the second time she met with Detective Teixeira and why she wouldn't. She was—specifically said, you know, basically, you—someone threatens your father, your brother, you, and you do nothing about it, all to suggest that this is a fabrication, and that her motives for not coming to the police are false. Therefore, the door has been opened, and it is probative for the jury to understand. And she was asked about the nature of their relationship, why she maintained sexual relations with the defendant. All of which go to her experience with this defendant, her motives for doing what she did when—and when she did it. And so for those reasons, I will allow [it to come into evidence] . . . .

"All of the cross-examination questions were designed to paint this witness as lying; therefore, her experience with the defendant directly relates to the cross-examination of the witness and her reasons for doing what she did. So, I will allow her testimony relating to the altercation with her father, that—that what he stated, that he wanted to get even, her observations about his temper, given the length of their relationship and her reasons, as well as the fact that he smashed windows. That he threatened her in the past goes to the believability of why she would or would not have gone to the police the day of August 9th. . . . And the state ought to be entitled to ask her about that, since she was extensively cross-examined about her credibility as to why she did or did not tell the police the entire story on August 21st when she met with them."

After a recess, the court summarized the basis for its ruling and indicated that it would provide the jury with a limiting instruction either prior to or at the conclusion of Wilma's testimony. Defense counsel then objected, arguing that the prejudicial effect of this evidence far outweighed its probative value. In a dialogue with defense counsel, the court noted that the cross-examination of Wilma "was very broad, very extensive, challenging her motivations, challenging her credibility . . . . You questioned her about the nature of their relationship and why it changed and when it changed and why she did what she did, suggesting that she made up the story. And therefore, because your cross-examination was so broad, it opened the door to her knowledge of your client's temper, and how he acts and reacts, to come in. And for that reason, I find the evidence to be—yes, it's prejudicial, but it's also highly probative in light of the cross-examination. The probative value far outweighs the prejudicial impact of this evidence."

After the jury returned, the state conducted its redirect examination of Wilma. She first testified that the defendant had a violent demeanor and a temper at times. She iterated that prior to August 9, 2014, he had threatened her five or six times. Wilma informed the jury that in May, 2014, the defendant had challenged her father to a fight. She further stated that in the year prior to August 9, 2014, the defendant had told her about an incident in which he damaged a number of automobiles with a crowbar. He explained that he had lost his wallet containing rents that had been paid to him as the reason for this conduct. At the conclusion of Wilma's testimony, the court provided the jury with a limiting instruction with respect to his conduct toward Wilma's father and the smashing of car windows.[19]

The defendant subsequently testified. He stated that despite never shooting or owning a gun, he had wanted to purchase one for protection. He further testified that, with respect to his relationship with Wilma, they never had a serious argument and that it was a "pleasant, respectful [relationship] from both sides." He also stated that prior to January, 2015, he never verbally threatened or physically abused her. The defendant indicated that in January, 2015, he was very lonely and depressed, drinking heavily, and had contemplated taking his own life. On January 16, 2015, after drinking alcohol and feeling resentment toward Wilma for "disappearing" from his life and choosing to "side" with the victim's family, the defendant sent her a series of derogatory and insulting text messages. See footnotes 6 and 7 of this opinion.

Outside the presence of the jury, the state indicated that it would cross-examine the defendant regarding his smashing of car windows on November 2, 2013. Additionally, the state intended to question the defendant regarding an incident in March, 2014, where the

defendant, with drugs or alcohol in his system, was taken to the hospital, threatened the staff, threw medical equipment and left before receiving treatment. The court then noted that, in addition to these two incidents, the state also planned to cross-examine the defendant regarding his attempt to engage Wilma's father in a physical altercation.

After hearing argument, the court observed that during his direct examination, the defendant had denied threatening Wilma prior to the January, 2015 text messages, and that those text messages were a result of his depression and use of alcohol following the end of their relationship. "So, the impression that he left this jury with is that his threatening behavior in the text messages were fueled by a new approach in his life, which is to drink his life away. By using the term, at this point in my life, he's trying to leave the jury with the impression that his drinking and substance abuse began after . . . August 9, 2014. When, in fact, a lot of these incidents, and the ones that brought him to the hospital, would suggest otherwise. So, given his testimony about his conduct and his own self-serving statement that prior to this time in his life, and only at this point in his life, he started drinking. I think he's opened up the door to some of this history."

During cross-examination, the state questioned the defendant about his smashing of car windows on November 2, 2013. The defendant admitted that after the car windows incident, he was taken to the hospital and was "highly intoxicated . . . ." The state then turned to the events of March 22, 2014, and introduced into evidence the defendant's medical records from that night, his second visit to the hospital while intoxicated. This exhibit provided that the defendant had arrived at the emergency department of Bridgeport Hospital at 8:09 p.m. He claimed to have been assaulted and had a laceration under his left eye. In the notes electronically signed at 8:42 p.m., a registered nurse wrote that the defendant had left without being treated by medical personnel after "swearing" and throwing a "bloody ice pack" at an employee due to a long wait. In his testimony, the defendant seemed to deny complaining about the wait time to be seen, as well as throwing the ice pack.[20]

A

First, we consider the defendant's arguments regarding the November 2, 2013 incident involving his smashing of car windows and his May, 2014 challenge to physically fight Wilma's father. The court ruled that Wilma's testimony regarding these two incidents was relevant to and highly probative of her credibility, namely, "why she would or would not have gone to the police the day of August 9th." The court further indicated that defense counsel had opened the door in his cross-examination of Wilma. The court specifically

noted defense counsel's efforts to suggest that her reasons for not going to the police on August 9, 2014, were false. Defense counsel then argued that the prejudicial impact of this evidence outweighed the probative value. The court considered, and rejected this argument, concluding that the probative value far outweighed the prejudice.

1

The trial court appears to have permitted Wilma's testimony as to these two incidents as both prior misconduct evidence[21] and because defense counsel opened the door to the prosecutor's questioning as to those incidents.[22] See, e.g., *State* v. *Zachary F.*, 151 Conn. App. 580, 584–85, 95 A.3d 563 (inadmissible prior misconduct evidence may become admissible through "opening the door" doctrine), cert. denied, 314 Conn. 919, 100 A.3d 851 (2014). We emphasize that defense counsel's strategy during his cross-examination of Wilma, in part, was to raise a question of credibility in the minds of the members of the jury. Specifically, defense counsel questioned Wilma as to why she would continue to engage in sexual conduct with the defendant after he had threatened her, her father and her brother, and not report these threats to the police. Simply put, defense counsel attempted to persuade the jury that Wilma was not a credible witness.

In *State* v. *Estrella J.C.*, 169 Conn. App. 56, 95, 148 A.3d 594 (2016), we noted that § 4-5 (a) of the Connecticut Code of Evidence prohibits the admission of evidence of other crimes, wrongs or acts to prove the bad character, propensity or criminal tendencies of a person. Subsection (c) of that provision of our evidence code provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Internal quotation marks omitted.) Id., 96.

We then noted that the official commentary to § 4-5 (c) provides in relevant part: "Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be admissible, the court must determine that the evidence is probative of one or more of the enumerated purposes for which it is offered, and that its probative value outweighs its prejudicial effect. . . . The purposes enumerated in subsection (c) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive. Neither subsection (a) nor subsection (c) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or

acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors." (Emphasis omitted; internal quotation marks omitted.) Id.

Under the facts of that case, we then concluded that the uncharged misconduct evidence was relevant to the issue of the victim's credibility. Id., 96–97. Specifically, the victim's credibility had been called into question as a result of his testimony that he lied and stole. Id., 98. The testimony that the defendant in that case had told the victim to steal was properly used to rehabilitate the victim's credibility. Id.

In the present case, the court determined that allowing Wilma to testify about the November 2, 2013 and May, 2014 incidents functioned as a proper means to rehabilitate her credibility. Additionally, it concluded that her testimony regarding these two incidents was admissible pursuant to the opening the door doctrine following defense counsel's attack on her credibility. We conclude that the court's rulings that this evidence was admissible as uncharged misconduct evidence or admissible pursuant to the opening the door doctrine did not constitute an abuse of discretion.

2

Next, we turn to the question of whether the prejudicial impact of Wilma's testimony regarding these two incidents outweighed its probative value. Defense counsel argued to the trial court that this evidence painted "the defendant as a bad person, [a] person who loses their temper, [and it] far outweigh[ed] any probative value . . . ." The court acknowledged that the challenged testimony was prejudicial. Nevertheless, the court determined that his evidence was "highly probative in light of [Wilma's] cross-examination" and that any prejudice was "far" outweighed by its probative value. The court also provided the jury with a limiting instruction at the conclusion of Wilma's testimony.

We are mindful that "[w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion. . . . Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.) *State* v.

*Morales*, 164 Conn. App. 143, 180, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016).

On appeal, the defendant maintains that the evidence had "nominal" probative value. He ignores, however, the court's basis for determining the strong probative value of this evidence—the prosecutor's rebuttal of his attack on Wilma's credibility during cross-examination. This evidence served to explain and put into context the actions and testimony of Wilma, a significant witness for the state. We are not persuaded that this evidence improperly inflamed the emotions of the members of the jury. See *State* v. *Gonzalez*, 167 Conn. App. 298, 310–11, 142 A.3d 1227, cert. denied, 323 Conn. 929, 149 A.3d 500 (2016). Attempting to engage Wilma's father in a physical altercation and smashing car windows are less shocking in nature than driving a motor vehicle into an individual, dragging that individual under the vehicle or attempting to interfere with the testimony of a witness. See, e.g., *State* v. *Morales*, supra, 164 Conn. App. 181 (admission of evidence not unduly prejudicial when prior acts of misconduct substantially less shocking than crime charged); *State* v. *Zubrowski*, 101 Conn. App. 379, 395–96, 921 A.2d 667 (2007) (court did not abuse discretion in concluding that prejudicial impact of testimony that defendant had been physically and verbally abusive to his wife did not outweigh its probative value in light of nature of murder of wife by slashing her throat), appeal dismissed, 289 Conn. 55, 956 A.2d 578 (2008), cert. denied, 555 U.S. 1216, 129 S. Ct. 1533, 173 L. Ed. 2d 663 (2009). Additionally, any prejudicial effect was lessened by the court's limiting instruction given to the jury at the conclusion of Wilma's testimony. See *State* v. *Zubrowski*, supra, 396; see also *State* v. *Grant*, 179 Conn. App. 81, 94, 178 A.3d 437, cert. denied, 328 Conn. 910, 178 A.3d 1041 (2018); *State* v. *Morales*, supra, 181–82.

For these reasons, we conclude that the court did not abuse its discretion in determining that the probative value of these two incidents outweighed their prejudicial impact. Affording every reasonable presumption in favor of the court's ruling, we conclude that the defendant has not demonstrated a manifest abuse of discretion or that an injustice resulted. See *State* v. *Collins*, 299 Conn. 567, 592, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

B

Finally, we consider the defendant's arguments regarding the March 22, 2014 incident at the hospital where the intoxicated and belligerent defendant threw a bloody ice pack at an employee working in the emergency department. As we noted previously, the defendant testified that, at the time he sent the offensive text messages to Wilma, his life "was all screwed up." He stated that during that time period, he was unemployed, had been forced to leave his home, Wilma had disap-

peared from his life, the holiday season had just ended, and he had been portrayed as a "monster" by the media. He claimed to be stressed, consuming an excessive amount of alcohol and contemplating suicide. His testimony conveyed the impression that the text messages to Wilma constituted an atypical course of conduct for him, a result of his mental state and alcohol consumption.

After hearing argument, the court noted that the defendant "left this jury with [the impression] that his threatening behavior in the text messages [was] fueled by a new approach in his life, which is to drink his life away. By using the term, at this point in my life, he's trying to leave the jury with the impression that his drinking . . . began after August—August 9, 2014. When, in fact, a lot of these incidents, and the ones that brought him to the hospital, would suggest otherwise. So, given his testimony about his conduct and his own self-serving statement that prior to this time in his life, and only at this point in his life, he started drinking. I think he's opened the door to some of this history." During cross-examination, the prosecutor questioned the defendant briefly about his March 22, 2014 visit to the emergency department at the hospital.[23]

We iterate that "a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party." (Internal quotation marks omitted.) *State* v. *Frazier*, 181 Conn. App. 1, 23, 185 A.3d 621, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

During his testimony, the defendant provided the jury with the impression that he sent the offensive text messages to Wilma only after he had become depressed and started drinking heavily. In other words, he claimed that only the combination of stressors and increased alcohol consumption in January, 2015, resulted in sending crude messages to Wilma. After this subject area arose in direct examination, the state was free to present evidence that the defendant previously had exhibited similar behavior. On the basis of the defendant's direct examination, we cannot say that the court abused its discretion in concluding that he had opened the door to other incidents where he had consumed alcohol and acted in such a manner.

Finally, we consider, and reject, the defendant's argument that the prejudicial impact of the March 22, 2014 evidence outweighed its probative value. See *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013). We note that the state did not conduct a lengthy examination regarding this evidence. See *State* v. *Frazier*, supra, 181 Conn. App. 25–26. Furthermore, we are not persuaded that the jury's hearing testimony and considering docu-

mentary evidence regarding the defendant's conduct in the emergency department constituted undue prejudice given the facts and circumstances of this case. Accordingly, we conclude that the defendant failed to establish that the prejudicial effect of this evidence outweighed its probative value. Therefore, this argument fails.

## IV

Next, the defendant claims that the court abused its discretion in admitting into evidence crude and vulgar text messages he had sent to Wilma. Specifically, he argues that the prejudicial impact of these "highly inflammatory" text messages outweighed their probative value and that their improper admission was harmful. The state counters that the court's ruling did not constitute an abuse of discretion and, in the alternative, that any such error was harmless. We agree that the court did not abuse its discretion in determining that the probative value of the text messages outweighed their prejudicial impact.

The following additional facts are necessary for our discussion. Outside the presence of the jury, the court noted the state's intention to introduce into evidence the text messages sent by the defendant to Wilma in January, 2015. Defense counsel objected solely[24] on the ground that "the prejudicial value of some of these text messages outweighs the probative value of them." Specifically, he objected to the January 16, 2015 text message at 9:23 p.m., the two text messages at 10:15 p.m., the text message at 10:28 p.m. and the text message at 10:31 p.m. See footnote 7 of this opinion. The court overruled defense counsel's objections.[25]

We set forth the relevant legal principles and our standard of review. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Small*, 180 Conn. App. 674, 683, 184 A.3d 816, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018); see also *State* v. *Bell*, 113 Conn. App. 25, 45, 964 A.2d 568, cert. denied, 291 Conn. 914, 969 A.2d 175 (2009). With respect to the balancing of the probative value and prejudicial impact, we indulge in every reasonable presumption in favor of the ruling of the trial court. *State* v. *Estrella J.C.*, supra, 169 Conn. App. 99; see also *State* v. *Kalil*, 314 Conn. 529, 548, 107 A.3d 343 (2014); *State* v. *Coccomo*, 302 Conn. 664, 671, 31 A.3d 1012 (2011).

"There are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982); see also *State* v. *Gerald A.*, 183 Conn. App. 82, 108–109, 191 A.3d 1003, cert. denied, 330 Conn. 914, 193 A.3d 1210 (2018).

The defendant appears to focus this argument on the first situation, that is, that these text messages, which he claims painted him as a "loathsome person," unduly aroused the hostility and emotions of the jury. We conclude that the court did not abuse its discretion in overruling the objection to the text messages on the ground that the prejudicial impact outweighed their probative value. We emphasize that "[p]rejudice is . . . measured by . . . the impact of that which is extraneous." *State* v. *DeMatteo*, supra, 186 Conn. 703.

In the present case, the court determined, and defense counsel did not contemporaneously challenge, that the probative value of the text messages was "incredibly high and [outweighed] its prejudicial impact." Thus, the court properly balanced the probative value of the text messages against their prejudicial impact. See, e.g., *State* v. *Rosario*, 99 Conn. App. 92, 105, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007). Specifically, the court noted that the jury had heard the audio recording of the police interview with the defendant in which he used similar language.

Case law supports our conclusion. For example, in *State* v. *Joly*, 219 Conn. 234, 248–49, 593 A.2d 96 (1991), the defendant claimed, inter alia, that the trial court should have excluded statements from a police detective recounting the defendant's unsolicited remarks made during the execution of a search and seizure warrant. The police detective testified that the statements made by the defendant at his apartment regarding the fifteen year old murder victim were made in a "remorseless tenor" and contained "expletives and sexually explicit language." Id., 254. Our Supreme Court acknowledged that these aspects of the detective's testimony "unquestionably had the tendency adversely to affect the jury's attitude toward the defendant . . . ." Id. Furthermore, it noted that, had it been serving as the trial court, it may well have determined that this testimony was too prejudicial. Id. It ultimately concluded, however, that the trial court had not abused its broad discretion in performing the difficult task of

balancing the probative value against the prejudicial impact. Id.; see also *State* v. *Bush*, 249 Conn. 423, 430–31, 735 A.2d 778 (1999) (after careful review of record, no reasonable possibility that epithets used by defendant in conversations where he planned to threaten witnesses unduly aroused jury's emotions or unduly distracted jury from main issue in case). Similarly, we conclude in the present case that the court properly considered the prejudicial effect of the defendant's crude language and did not abuse its discretion in allowing the text messages to be admitted into evidence.

V

Finally, the defendant claims that the court improperly instructed the jury on self-defense, thereby violating his rights under the fifth, sixth and fourteenth amendments to the United States constitution.[26] Specifically, he argues that the court improperly (1) instructed the jury on the initial aggressor and provocation exceptions to a claim of self-defense[27] and (2) included an objective standard in the portion of the instructions explaining the statutory retreat exception to the use of deadly physical force in self-defense.[28] The state counters that, with respect to the former, the court's instructions were proper, and as to the latter, the court committed harmless error in failing to convey the subjective component of the duty to retreat in its instructions. We agree with the state.

We begin with our standard of review and the legal principles relevant to a claim of constitutional error in a jury instruction. "[I]ndividual jury instructions should not be judged in artificial isolation . . . but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . . A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Newton*, 330 Conn. 344, 359–60, 194 A.3d 272 (2018); *State* v. *Si*, 184 Conn. App. 402, 410, 194 A.3d 1266 (2018).

Next, we recite our Supreme Court's "brief review of the law of self-defense. Under our Penal Code, self-

defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. . . . Whereas an affirmative defense requires the defendant to establish his claim by a preponderance of the evidence, a properly raised defense places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. . . . Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 631–32, 123 A.3d 398 (2015).

The following additional facts are necessary for our discussion. During the first days of the trial, the court observed, and the parties did not dispute, that self-defense was not an issue in the proceedings. On October 19, 2016, the state called Christopher LaMaine, a Bridgeport police lieutenant, as a witness. LaMaine testified that he and other members of the police department traveled to the defendant's home on the morning of August 10, 2014. Upon his arrival, LaMaine noticed damage to the "front area and the driver's side" of the defendant's Avalanche. The defendant invited the police officers into his home shortly after 9 a.m. LaMaine and Teixeira interviewed the defendant in his kitchen. The defendant initially claimed to have been at his brother's home in Dayville at 10 p.m. the prior night, but he eventually admitted that he had operated the Avalanche in Bridgeport at that time.

During direct examination by the prosecutor, LaMaine recounted the conversation he had with the defendant regarding the physical condition of the Avalanche:

"A. . . . I asked him about the condition of his vehicle the night before; if that damage had been there. Initially, he told me that that damage was old, that it occurred that April, about four months earlier. Then he went on to tell me the story about how it had occurred. And then later he changed his story.

"Q. And the story changed to one—when he changed his story, was it as to when it occurred or how it occurred or both?

"A. Both.

"Q. Okay. And how did it change, please?

"A. Well, he eventually told me that two people threw rocks at his vehicle at the corner of Noble [Avenue] and Jane [Street] that night before. This got into the story where he said that he did strike the victim."

The prosecutor played the audio recording of LaMaine's interview with the defendant for the jury.

During cross-examination, LaMaine agreed with defense counsel that the defendant had stated in the interview that while at the corner of Noble Avenue and Jane Street, "two kids ran up and threw what he called boulders at his truck . . . ." LaMaine testified that at the conclusion of the interview, he went to the corner of Noble Avenue and Jane Street and found some rocks, which were collected and processed as evidence.[29]

On October 20, 2016, the fourth day of the trial, defense counsel informed the court that, in addition to his claim that the death of the victim was the result of an accident, he planned to pursue a claim of self-defense.[30] On October 24, 2016, the defendant testified that he had wanted to purchase a gun on August 9, 2014, because William had threatened and harassed him for "pretty much the whole summer [and] spring." The defendant claimed that William had driven by and pointed a gun at him a few days prior to August 9, 2014. He also stated that on the morning of August 9, 2014, prior to the incident, there was no damage to the hood, windshield or upper section of the door of the Avalanche.

The defendant's direct examination continued the next day and he claimed that on the night of August 9, 2014, he stopped at a stop sign when he heard a "boom" and heard something hit the front door of the Avalanche. On the basis of his clashes with people in the neighborhood, including William, the defendant posited that "somebody was shooting at [him]." After another rock struck the windshield, the defendant, under the assumption that he was being shot at and that his life was in danger, sought to protect himself and escape from the situation. The defendant testified that he observed the victim and Griffin in the intersection. Wanting to flee, the defendant drove off while in a "downward protected position."

After returning to his home, the defendant stated that he assessed both his body and his vehicle for damage. He returned to the scene to check if he had hit anyone. The defendant assumed that "nothing serious [had] happened" and proceeded to his brother's home in Dayville.

The defendant further testified that when he returned to Bridgeport the next morning, his residence had been ransacked. Almost immediately thereafter, police officers arrived, and he spoke with LaMaine and Teixeira. The defendant iterated that he had heard two loud noises before running into the victim and that he feared for his life during this encounter.

After the parties rested, the court discussed the proposed jury instructions on the record. Defense counsel objected to the proposed instructions regarding the provocation and initial aggressor exceptions to self-defense, arguing that there was no evidence to support such instructions. The court responded: "The evidence

of the initial aggressor or provocation is the testimony of Justin Griffin, if they choose to believe it, that [the defendant], about an hour earlier, drove down the street with the lights off, revved up the engine and tried to hit him with his car."[31]

Defense counsel responded that neither an initial aggressor nor a provocation instruction was warranted due to the one hour gap between these two incidents. The prosecutor disagreed that this brief time period necessitated a conclusion that the two incidents were separate and distinct. Defense counsel again argued that there was no evidence that Griffin and Tate had thrown the rocks at the Avalanche because the defendant had attempted to run them down earlier that evening. Defense counsel repeated that because of the one hour time gap, neither exception applied.

The next day, prior to closing arguments and the jury instructions, the court again addressed the jury instructions: "And then the other issue was the defense request that I not charge initial aggressor. [Defense counsel] abandoned the claim as to provocation, but insisted that initial aggressor was an error. And I pointed out that—that I believed, certainly—and I reviewed the testimony of Mr. Griffin, he talks about an incident earlier that evening where the defendant is—is at a stop sign with his lights out and just sitting there for a few minutes, and then revs up the engine and comes at them and swerves at them and they jump onto the sidewalk to avoid being hit by his truck.[32] So, there was that incident . . . .

"So, there are two very diverging theories here. The state's theory is there were no rocks and that this defendant was the only aggressor, not just the initial aggressor, but the only aggressor. And the defense theory is that the—the victim and his friend were the initial aggressors, or were throwing rocks at him and he acted in self-defense. Both sides are entitled to argue to the jury, but the evidence that the court heard would suggest that there is an appropriate instruction for initial aggressor." (Footnote added.) The court then considered the defendant's argument that there cannot be a valid initial aggressor exception to self-defense when a one hour time period existed between the first incident and the fatal one. On the basis of its research, the court concluded that such a determination was reserved for the jury.

Later that day, the court instructed the jury. The court's charge included instructions on the provocation and initial aggressor exceptions to self-defense.[33] The court also instructed the jury on the duty to retreat exception to the use of deadly physical force in self-defense.[34] See General Statutes § 53a-19 (b) (1).[35] We now turn to the defendant's specific claims of instructional error.

## A

The defendant first argues that the court improperly instructed the jury on the initial aggressor and provocation exceptions to self-defense. Specifically, he contends that there was no evidence to warrant instructing the jury on these two exceptions to self-defense. He also argues that the initial aggressor instruction was improper because he had effectively withdrawn from the initial incident. We are not persuaded by either of these arguments.

The court's proposed jury charge, dated October 24, 2016, contained instructions on the statutory exceptions of provocation and initial aggressor. The next day, defense counsel objected to the inclusion of these exceptions in the court's instructions, thereby preserving the defendant's claims for appellate review.[36] Accordingly, we proceed to the merits of the defendant's claim.

We start with the relevant legal principles and our standard of review. Our Supreme Court has stated that when determining whether a party is entitled to a particular jury instruction, we must consider the evidence in a light most favorable to providing that instruction. *State* v. *Bryan*, 307 Conn. 823, 826, 60 A.3d 246 (2013). "If . . . the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) *State* v. *Schovanec*, 326 Conn. 310, 318–19, 163 A.3d 581 (2017); see also *Bharrat* v. *Commissioner of Correction*, 167 Conn. App. 158, 169, 143 A.3d 1106 (party seeking certain instruction bears initial burden of producing sufficient evidence and conversely, court has duty not to charge jury on issue for which evidence would not reasonably support finding), cert. denied, 323 Conn. 924, 149 A.3d 982 (2016); see generally *State* v. *Bryan*, supra, 834–35.

The defendant focuses his appellate argument on the length of time between the incidents on August 9, 2014. Specifically, he claims that because approximately one hour had elapsed, from the time he allegedly accelerated his vehicle and drove it at the victim, Griffin and Shuler with his lights off, and when he claimed that the rocks were thrown at his Avalanche and drove it over the victim, the evidence did not support a jury instruction on either the provocation or initial aggressor exceptions to self-defense. He also argues that, with respect to the initial aggressor claim, the evidence demonstrated that he withdrew from the encounter and effectively communicated that withdrawal, thereby defeating this exception to self-defense. See General Statutes § 53a-19 (c) (2). We are not persuaded by

his arguments.

1

First, we consider the defendant's contention that the court improperly instructed the jury on the initial aggressor exception to self-defense. "A defendant who acts as an initial aggressor is not entitled to the protection of the defense of self-defense." *State* v. *Skelly*, 124 Conn. App. 161, 167–68, 3 A.3d 1064, cert. denied, 299 Conn. 909, 10 A.3d 526 (2010); see also General Statutes § 53a-19 (c) (2); *State* v. *Beltran*, 246 Conn. 268, 276, 717 A.2d 168 (1998) (concept of initial aggressor is limitation on what would otherwise constitute valid defense of use of force in self-defense). An initial aggressor may, however, avail himself of the defense of self-defense if he withdraws from the encounter and effectively communicates to such other person his intent to do so. *State* v. *Pauling*, 102 Conn. App. 556, 583, 925 A.2d 1200, cert. denied, 284 Conn. 924, 933 A.2d 727 (2007); see also *State* v. *Osimanti*, 299 Conn. 1, 28–29, 6 A.3d 790 (2010) (initial aggressor must withdraw or abandon conflict in such way that adversary is aware that he is no longer in any danger from initial aggressor).

In *State* v. *Jimenez*, 228 Conn. 335, 340, 636 A.2d 782 (1994), our Supreme Court concluded that, under our law, the first person to use physical force is not necessarily the initial aggressor. "Read according to its plain language, and as a whole, doubtlessly § 53a-19 contemplates that a person may respond with physical force to a reasonably perceived threat of physical force without becoming the initial aggressor and forfeiting the defense of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assailant struck the first blow before responding. If an assailant were intending to employ deadly force or inflict great bodily harm, such an interpretation of the statute would be extremely dangerous to one's health. Such a bizarre result could not have been intended by the legislature." Id., 341.

We are cognizant that the court had a duty not to submit to the jury, in its charge, an issue upon which the evidence would not reasonably support a finding. *State* v. *Whitford*, 260 Conn. 610, 625, 799 A.2d 1034 (2002); *State* v. *Wortham*, 80 Conn. App. 635, 649, 836 A.2d 1231 (2003), cert. denied, 268 Conn. 901, 845 A.2d 406 (2004). Additionally, when the evidence warrants an initial aggressor instruction, the question of whether the defendant acted as an initial aggressor, and thus was disentitled to the protection of the defense of self-defense, is for the fact finder. See *State* v. *Skelly*, supra, 124 Conn. App. 168–70.

The state presented evidence that approximately one hour prior to the fatal impact, the defendant, with his headlights off, revved his engine and swerved his Avalanche toward the victim, Griffin and Shuler, causing

them to jump onto the sidewalk for safety. On the basis of this testimony, the jury reasonably could have found that the defendant was the initial aggressor and, thus, was not justified in using any physical force. See, e.g., *State* v. *Pauling*, supra, 102 Conn. App. 583–84 (court properly provided initial aggressor instruction where state presented evidence that defendant grabbed victim first and began slapping her face). Moreover, the defendant has not provided us, nor have we located, a case from this jurisdiction holding that the passage of one hour necessarily renders the initial aggressor exception inapplicable. See, e.g., *State* v. *Prioleau*, 235 Conn. 274, 277–78, 292–94, 664 A.2d 743 (1995) (initial aggressor instruction given where defendant and victim had heated argument in November, 1991, when defendant stated he would "get" the victim, who expressed fear and concern that situation had escalated out of control, and on December 1, 1991, defendant shot and killed victim).

Likewise, we are not persuaded that the evidence required a conclusion that the defendant had withdrawn and communicated his intent to withdraw so that the initial aggressor instruction was improper. See *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991) ("[A]n instruction as to the effect of an aggressor withdrawing from an encounter and communicating the intent to withdraw is only necessary where the particular factual situation supports such an instruction. . . . Further, the doctrine of communicated withdrawal may not be invoked unless the aggressor's intent to withdraw is clearly made known to his victim. . . . In other words, the initial aggressor must withdraw or abandon the conflict in such a way that the fact of withdrawal is perceived by his opponent, so that his adversary is aware that he is no longer in any danger from the original aggressor." [Citations omitted; internal quotation marks omitted.]). A reasonable jury could conclude that the defendant had not communicated his withdrawal so as to nullify the initial aggressor exception to self-defense. We conclude, therefore, that the court's instructions on the initial aggressor exception to self-defense were not improper.

2

Next, we consider the defendant's contention that the court improperly instructed the jury on the provocation exception to self-defense. Section 53a-19 (c) provides that "a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person . . . ." See also *State* v. *Corchado*, 188 Conn. 653, 664, 453 A.2d 427 (1982); *State* v. *Turner*, 33 Conn. App. 616, 618, 637 A.2d 3 (1994).

The rationale for our rejection of the defendant's initial aggressor argument applies to his provocation argument. We disagree that the act of swerving his

vehicle toward the victim, Griffin and Shuler was indisputably a separate incident and foreclosed the jury from finding that it was done with the requisite intent for provocation. There was evidence before the jury that the defendant had targeted individuals for physical harm, that he had taken steps in an attempt to purchase a gun earlier that day, and that he sought revenge against those in the neighborhood who allegedly had harassed him. The state presented adequate evidence to warrant a provocation instruction. Accordingly, we reject this claim.

B

The defendant next argues that the court improperly instructed the jury with respect to the retreat exception to the use of deadly physical force. Specifically, he contends that the court improperly used an objective standard in defining the knowledge element. The state agrees that this claim was preserved for appellate review and that the challenged instruction failed to convey properly the subjective standard of the duty to retreat. It maintains, however, that the erroneous instruction was harmless beyond a reasonable doubt. We agree with the state.

A distinction exists between the use of nondeadly physical force and deadly physical force in a case involving self-defense. See *State* v. *Singleton*, 292 Conn. 734, 747, 974 A.2d 679 (2009). The determination of whether the use of deadly physical force in a case of self-defense was warranted involves a subjective-objective inquiry. See *State* v. *Prioleau*, supra, 235 Conn. 286–87; see also *State* v. *O'Bryan*, supra, 318 Conn. 632–33; *State* v. *Reddick*, 174 Conn. App. 536, 552–53, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied,      U.S.      , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018). If the use of deadly physical force is appropriate, the state still may defeat such a claim if it proves, beyond a reasonable doubt, that the defendant knew that he could retreat in complete safety. *State* v. *Singleton*, supra, 747. Subsection (b) of § 53a-19 contains a subjective test that states that a defendant is not justified in using deadly physical force in self-defense "if he . . . knows that he . . . can avoid the necessity of using such force with complete safety (1) by retreating . . . ." See, e.g., *State* v. *Ash*, 231 Conn. 484, 494–95, 651 A.2d 247 (1994) (improper instruction where court's charge suggested that § 53a-19 permitted jury to measure defendant's knowledge of ability to retreat according to objective standard of reasonableness rather than subjective standard of his actual knowledge); *State* v. *Carter*, 48 Conn. App. 755, 769–70, 713 A.2d 255 (§ 53a-19 [b] requires recourse to retreat in lieu of deadly physical force only when defendant himself knows he can avoid necessity of using such force with complete safety), cert. denied, 247 Conn. 901, 719 A.2d 905 (1998).

In the present case, the disputed issue is not whether the use of deadly force was warranted but, rather, whether the court properly instructed the jury on the retreat exception to the use of deadly physical force in self-defense. See General Statutes § 53a-19 (b). The court initially used a subjective standard when it provided the jury with an instruction on the duty to retreat.[37] Thereafter, it used an objective standard of reasonableness when it instructed the jury to consider whether the defendant's use of deadly physical force was not justified on the basis of the opportunity to retreat with complete safety.[38] We agree with the parties that the court's inclusion of an objective standard regarding the statutory duty to retreat was improper. See *State* v. *Rios*, 171 Conn. App. 1, 49–50, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017).

Having concluded that the court's instruction on the duty to retreat was improper, we turn to the question of harmlessness. See *State* v. *Prioleau*, supra, 235 Conn. 288. "If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmlessness beyond a reasonable doubt. . . . [A]n instructional constitutional error is harmless if there is no reasonable possibility that the jury was misled. . . . In performing harmless error analysis, we keep in mind that [i]n determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 158 Conn. App. 315, 357, 118 A.3d 728, cert. granted on other grounds, 319 Conn. 907, 908, 123 A.3d 437, 438 (2015) (appeals withdrawn May 4 and 5, 2016); see also *State* v. *Flowers*, 278 Conn. 533, 543–44, 898 A.2d 789 (2006); see generally *State* v. *Prioleau*, supra, 288 (harmlessness of jury instruction error gauged by reference to evidence and issues and charge as whole).

We begin with our Supreme Court's decision in *State* v. *Quintana*, 209 Conn. 34, 547 A.2d 534 (1988). In that case, the defendant stabbed the victim in the chest on a sidewalk. Id., 36. The defendant's former girlfriend testified that two days after the stabbing, the defendant had claimed that the stabbing was done in self-defense. Id. The defendant's friend, however, testified that the defendant had stated that he killed the victim during an attempted robbery. Id., 37.

On appeal, the defendant claimed, inter alia, that the trial court improperly had instructed the jury on the duty to retreat. Id., 44–45. The state conceded that the court's instruction was improper, but claimed that the error was harmless. Id., 46. Our Supreme Court first noted that "[t]he charge must be considered from the standpoint of its effect on the jury in guiding [it] to a proper verdict" and that the instruction, read as a whole, "presented the case to the jury in a manner so that no injustice . . . result[ed]." (Internal quotation marks omitted.) Id., 47. It then reasoned that the only evidence of self-defense came from the testimony of the defendant's former girlfriend; this evidence, however, was contradicted by the friend's testimony of an intentional killing following an attempted robbery. Id. "In this posture, then, the evidence presented to the jury can fairly be said to center on the credibility of [the former girlfriend's] self-defense version of the stabbing, measured against the credibility of [the friend's] testimony that an attempted robbery was the motivating force behind the stabbing. The jury's verdict can fairly be read to indicate a choice between these two inconsistent versions of the stabbing, a choice that accepted the version presented by [the friend's] testimony and rejected the self-defense version presented by [the former girlfriend]. . . . The principal factual issues, therefore, were not classically dependent upon [the subtleties of the law of self-defense] for their proof, as is true in cases where the principal factual issue is the . . . [defendant's subjective knowledge of the availability of safe escape]." (Citation omitted; internal quotation marks omitted.) Id., 47–48. As a result, our Supreme Court concluded that the erroneous instruction on the duty to retreat was harmless. Id., 48.

Applying the reasoning of *Quintana*, our Supreme Court concluded that an improper instruction on the duty to retreat was harmless in *State* v. *Whitford*, supra, 260 Conn. 610. In that case, the victim shared an apartment with Bonnie Courchaine and Anna Holcomb. Id., 612. The defendant arrived to renew his relationship with Courchaine and to help ensure that the victim moved out. Id. A few days after the defendant's arrival, the victim and Holcomb became embroiled in an argument which resulted in police intervention. Id., 613. Responding officers asked Holcomb to leave the apartment to defuse the situation. Id. After she returned, Holcomb complained about the victim to the defendant. Id. The defendant told the victim that he needed to leave immediately; the victim, however, ignored the comment and walked toward his bedroom. Id. The defendant followed the victim and stabbed him twice in the side. Id.

At trial, the defendant claimed self-defense. Id., 614–15. The defendant testified that while Holcomb was in her bedroom, he watched television with the victim.

Id., 615. The defendant further testified that he inquired as to why the victim remained in the apartment when he knew that Courchaine and Holcomb wanted him to leave. Id. According to the defendant, the victim became enraged and jumped on top of him. Id. The victim choked the defendant while screaming at him. Id. The defendant unsuccessfully attempted to remove the victim's hands from his neck and then stabbed him. Id.

On appeal, the defendant argued, inter alia, that the court improperly instructed the jury on the duty to retreat because there was no evidence that retreat was a viable option. Id., 624–25. Our Supreme Court agreed that neither the defendant's evidence[39] nor the state's evidence[40] warranted a retreat instruction, and, thus, the instruction was improper. Id., 625–27.

The court in *Whitford* addressed the issue of harmlessness by discussing its decision in *Quintana*. Id., 628. It stated: "The manner in which the present case was tried is analogous to that of *Quintana*. The defendant sought to establish his self-defense claim only though his own testimony. The state, on the other hand, presented evidence to suggest that the defendant attacked the victim of his own volition in an attempt forcibly to persuade him to vacate the apartment. The state did not, however, introduce any evidence tending directly to defeat the particular elements necessary to establish the defendant's claim of self-defense. Thus, the jury here ultimately was faced with a credibility contest between two inconsistent versions of the altercation, as had been the jury in *Quintana*. The rule in *Quintana*, therefore, applies with equal force to the claimed instructional error now at issue . . . ." Id., 629; but see *State* v. *Ash*, supra, 231 Conn. 498 (factually distinguishable from *Quintana* because state's case hinged substantially on whether defendant failed to retreat within meaning of § 53a-19).

In the present case, the issue of self-defense did not arise until LaMaine's testimony several days into the trial. LaMaine recounted how the defendant initially stated during the August 10, 2014 interview that the damage to his Avalanche had occurred in April, 2014, but later changed his story and claimed that the victim and another individual actually caused it on August 9, 2014. The prosecutor played an audio recording of the August 10, 2014 interview for the jury in which the defendant claimed that the victim and another individual rapidly approached his vehicle and hurled boulders at it. After hearing the impact of the boulders, the defendant "hit the gas and hit the . . . [victim]." The defendant specifically stated that after the impact of the rocks, he "couldn't hit reverse, [he] didn't have time, [he] wasn't expecting [the victim] to do that." The defendant testified that when the boulders hit his Avalanche on August 9, 2014, "everything happened very quickly" and that he "just reacted." The defendant claimed that

he "consciously hit the gas to get out of there." He also stated that there was no time to determine whether he could have backed up his vehicle.

After a careful review of the evidence presented at the defendant's trial, we are persuaded that this is not a case classically dependent on the subtleties of the law of self-defense. See *State* v. *Quintana*, supra, 209 Conn. 47–48. First, we note that the defendant did not raise a claim of self-defense until several days into the trial. Second, the jury was faced with conflicting and inconsistent versions of the events of August 9, 2014, namely, whether the defendant intended to kill the victim with the Avalanche or whether the victim's death was a result of an accident or self-defense. The self-defense claim was established primarily through the defendant's August 10, 2014 interview with the police and by his own testimony. In contrast, the state presented evidence that the defendant had hit the victim with the truck intentionally. The jury, therefore, ultimately was required to resolve a credibility contest between the inconsistent versions of the events of August 9, 2014, at the intersection of Noble Avenue and Park Street. See *State* v. *Whitford*, supra, 260 Conn. 629; *State* v. *Quintana*, supra, 47–48. Finally, we note that neither party presented much evidence, or discussed in detail, the retreat exception to self-defense. For these reasons, we conclude that the improper instruction reasonably cannot be said to have misled the jury.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] The defendant was charged in three separate informations, which were consolidated for trial. In the first information, docket number CR-14-0281021-T, the state charged the defendant with murder in violation of General Statutes § 53a-54a (a), manslaughter in the first degree in violation of § 53a-55 (a) (1), manslaughter in the first degree in violation of § 53a-55 (a) (3), commission of a felony while on release in violation of General Statutes § 53a-40b (1), and commission of an offense while on release in violation of § 53a-40b (2). In the second information, docket number CR-15-0282776-T, the state charged the defendant with tampering with a witness in violation of § 53a-151 (a) and intimidating a witness in violation of § 53a-151a (a). In the third information, docket number MV-14-652530-T, the state charged the defendant with evading responsibility in the operation of a motor vehicle in violation of § 14-224 (a). Prior to trial, the court granted the defendant's motion to dismiss the count that alleged that he had committed an offense while on release. The jury found the defendant not guilty of murder, but guilty of manslaughter in the first degree in violation of § 53a-55 (a) (1), and the charges set forth in the second and third informations. The court noted during the sentencing proceeding that the state chose not to pursue the count alleging the commission of a felony while on release.

[2] Wilma testified that she registered the Avalanche in her name, but that the defendant was the person who drove it.

[3] Some of the witnesses' accounts varied as to the specific details of the night of August 9, 2014. The resolution of such discrepancies is reserved for the jury. See, e.g., *State* v. *Vega*, 181 Conn. App. 456, 491 n.12, 187 A.3d 424, cert. denied, 330 Conn. 928, 194 A.3d 777 (2018).

[4] Susan Williams, a pathologist in the Office of the Chief Medical Examiner, performed the autopsy of the victim and testified that the cause of the victim's death was blunt head, neck, torso and extremity trauma. She further explained that, "basically, he died from his head injuries."

[5] This damage included a cracked windshield and impact marks on the

hood of the Avalanche that appeared to have come from objects thrown at the vehicle.

[6] On January 14, 2015, at 10:04 p.m., the defendant sent the following series of text messages to Wilma:

"(1/3) I to this day don't know Wilma don't know what happened between us but I want u to know dat I love u more than anything in this world. There's not a day that passes

"(2/3) that I don't think of u or [your son]. U were my best friend and all I ever wanted was 2 grow old w u by my side. I can't turn back time but I can say dat I

"(3/3) love u w all my heart n I never ment to hurt u. I hope u find the happiness u deserve my cosita bella. U will always have a special place in my heart."

[7] On January 16, 2015, starting at 6:01 p.m. and ending at 10:46 p.m., the defendant sent Wilma the following text messages:

"[6:01 p.m.] Make sure u choose ur decision wisely! Janet [the victim's mother] n ur bro ain't gonna be around when this is all over! Choose wisely

"[9:23 p.m.] Since u n ur bro r so tight now. Ask him n Jessy [the girlfriend of William] y her mom was sucking my dick every other night after u n [your son] went home!

"[9:25 p.m.] Janet was texting 4 months trying 2 fucking me. Ur a sucker Wilma. I tried to explain 2 u da trash they were. Now u wanna play me.

"[9:27 p.m.] [My attorney] gonna rip all y'all a new Asshole! [Emoji omitted]

"[9:28 p.m.] Ur life is sad!

"[9:35 p.m.] I dedicated my life 2 u. . . . U piece of shit! Fuck my truck! U gonna find out wat Dennis Berrios is bout

"[9:53 p.m.] There using u like the stupid Bitch dat u are! Keep my truck Wilma. Tell them niggas were I'm at! Decisions come w consequences!

"[9:57 p.m.] Ur a piece of shit! U never had my back u fucking weirdo! U n ur bro will never beat me! I'm ready to die 4 this! Cunt

"[10:15 p.m.] Ask Jessy y her mom don't stop asking 2 SUCK MY DICK? Ask her? U look like trash being next 2 them. I'm out here. . . where ur people at! Let's keep it real

"[10:15 p.m.] Cunt

"[10:16 p.m.] Fuck u Wilma. . . . U a ho playing both sides of da fence. Y u got burnt

"[10:25 p.m.] (1/3) I was there 4 u while ur fam shitted on u. U played me this

"[10:25 p.m.] (2/3) whole time! I thought u were my friend! Ur a piece of shit like

"[10:25 p.m.] (3/3) ur brother n ur father! [Emoji omitted]

"[10:28 p.m.] Jessy mom used to watch u leave my house then would suck n swallow my nut 4 hours. Ur brother wld make sure u dint notice!

"[10:31 p.m.] I tried to tell u wat a piece of shit ur brother was. I stopped it when I truly fell in love w u. Janet kept trying 2 SUCK MY DICK all da time.

"[10:33 p.m.] U look like trash being next to them. . .but ur a Figueroa! Dats wat y'all stand 4! Garbage

"[10:42 p.m.] Ur a sucker like ur brother. . . . I'm out here. Wats good lil nigga!

"[10:43 p.m.] Wassup

"[10:46 p.m.] U fucked up"

On January 17, 2015, starting at 12:34 a.m. and ending at 12:46 a.m., the defendant sent Wilma the following text messages:

"[12:34 a.m.] I fucking hate u n will never 4get how u abandoned me. U 2 face piece of shit.

"[12:36 a.m.] U played both sides of the fence. I fucking loved u n [your son] w all my heart. U will pay 4 ur betrayal! Die motherfucker die. I'm standing on ur corner!

"[12:39 a.m.] Fucking suckas!

"[12:41 a.m.] 2face slut

"[12:46 a.m.] I put my dreams n future into our relationship! N u fucking took advantage of my love! I fucking hate u Wilma"

[8] At the conclusion of the state's case, the defendant moved for a judgment of acquittal as to the charges of violating §§ 53a-151 (a) and 53a-151a (a). Specifically, defense counsel stated: "I just move for judgment of acquittal just on the general ground that the state has not met its burden of proof regarding the elements of those offenses." The court denied the defendant's motion.

The defendant correctly contends that even if we were to conclude that he had failed to preserve this claim, he is entitled to review under *State* v.

*Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See, e.g., *State v. Faust*, 161 Conn. App. 149, 158–59, 127 A.3d 1028 (2015), cert. denied, 320 Conn. 914, 131 A.3d 252 (2016).

[9] The defendant's reliance on out-of-state authority is misplaced, as those cases are factually distinguishable from the present appeal. See, e.g., *State v. Bailey*, 346 Or. 551, 555–56, 213 P.3d 1240 (2009) (en banc) (Oregon Supreme Court concluded that it was not reasonable "for a jury to conclude—and to conclude beyond a reasonable doubt—that, when [the] defendant was warning his daughter against going through with the specific and imminent action *that she had threatened*—going to the police—he also specifically had in mind the remote-in-time prospect that she might be called to testify in a criminal proceeding against him that could arise out of her report to the police" [emphasis in original]).

[10] General Statutes § 19a-406 (a) provides in relevant part: "The Chief Medical Examiner shall investigate all human deaths in the following categories: (1) Violent deaths, whether apparently homicidal, suicidal, or accidental . . . ."

[11] See General Statutes § 19a-411 (a).

[12] See General Statutes § 19a-409.

[13] The Arizona Court of Appeals has explained that "[c]ause of death is the disease or injury responsible for the lethal sequence of events. . . . Manner of death explains how the cause of death arose." (Citation omitted; internal quotation marks omitted.) *State v. Sosnowicz*, 229 Ariz. 90, 94 n.4, 270 P.3d 917 (App. 2012); see also *State v. Tyler*, 867 N.W.2d 136, 155 (Iowa 2015) (Iowa administrative code defines cause of death as "the disease or injury which sets in motion the chain of events which eventually result in the death of a person" and manner of death as "the circumstances under which the cause of death occurred" . . . [and] "may be specified as . . . natural, accident, suicide, homicide, undetermined, or pending" [internal quotation marks omitted]); *State v. Vining*, 645 A.2d 20, 20 (Me. 1994) (medical examiner testified that manner of death refers to agent that causes death, i.e., natural cause, accident, suicide or homicide).

[14] Specifically, the defendant relies on the following cases: *State v. Tyler*, 867 N.W.2d 136, 156–57, 164–65 (Iowa 2015); *State v. Vining*, 645 A.2d 20, 20–21 (Me. 1994); *Bond v. Commonwealth*, 226 Va. 534, 311 S.E.2d 769 (1984); *State v. Sosnowicz*, 229 Ariz. 90, 270 P.3d 917 (App. 2012); and *People v. Eberle*, 265 App. Div. 2d 881, 882, 697 N.Y.S.2d 218 (1999).

[15] General Statutes § 19a-407 (c) provides in relevant part: "In conducting his investigation, the Chief Medical Examiner or his authorized representative shall have access to any objects, writings or other articles of property in the custody of any law enforcement official which in the Chief Medical Examiner's opinion may be useful in establishing the cause or manner of death. Upon the Chief Medical Examiner's request, a law enforcement official having custody of such articles shall deliver them to the Chief Medical Examiner, along with copies of any reports of the analysis of such articles by such law enforcement official. The Chief Medical Examiner shall analyze such articles and return them to the official from whom they were obtained. . . ."

[16] We acknowledge the following colloquy during the cross-examination of Williams by the defendant's counsel:

"Q. Okay. So—so, it was about four months later that you put down in your report that the manner was homicide?

"A. Correct.

"Q. All right. And obviously you were not a witness to what happened that brought about [the victim's] death, and a witness as far as being there, is that fair to say?

"A. That is.

"Q. Okay. And so is it fair to say that in order to reach the conclusion as to a manner of death that you had to reach, you waited until police continued their investigation?

"A. Correct.

"Q. And it was based on whatever information you received from the police that you ended up putting homicide down?

"A. Right."

At first blush, Williams' response could be read as an agreement that her determination regarding the manner of the death in this case was based solely on the information she had received from the police. Such a reading, however, ignores her testimony regarding her examination of the victim's body and injuries and the assistance she received from Uphoff.

[17] The defendant also raised a somewhat vague argument that the court improperly admitted evidence that he had "threatened people . . . ." The defendant did not object during Wilma's direct examination testimony stating that the defendant, on August 9, 2014, made threats against "Mike" and her brother, William, and claimed that he would make "Janet [the victim's mother] pay." Further, it was defense counsel, during cross-examination, who mentioned that Wilma previously had told Detective Teixeira that the defendant had threatened to kill her and her father. As a result, we decline to review the nebulous claim that the court erred in admitting evidence that the defendant had threatened "people . . . ."

[18] Specifically, the following colloquy occurred between defense counsel and Wilma:

"Q. And you weren't concerned that there was a potential [that your child] could be left without his mother and uncle and his grandfather?

"A. That's why I continued to see [the defendant]. I put myself in danger because I thought if I saw him, I would know his every move.

"Q. Okay. And did you think by continuing to have sex with him through October, that was just part of your strategy in watching his every move?

"A. Because I would keep him, you know, thinking that I was siding with him, or on his side. I didn't want to anger him more and cause more problems in the neighborhood where he's come out and hurt more people."

[19] Specifically, the court instructed the jury: "Ladies and gentlemen, I'm going to give you a limiting instruction. . . . The evidence that you just heard relating to the defendant's alleged conduct involving an incident with this witness—this witness' father and [the] incident relating to car windows being smashed is being admitted for a limited purpose. It is offered by the state to explain the witness' state of mind. This is not being admitted to prove the bad character of the defendant. You may consider such evidence if you believe it and further find . . . that it reasonably and logically supports the issue for which it is being offered by the state. On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not reasonably and logically support the issue for which it is being offered by the state, namely, that the conduct relates to this witness' state of mind, then you may not consider that testimony for any other purpose."

[20] The following colloquy occurred between the prosecutor and the defendant:

"Q. Did you deny that you swore and threw your bloody ice pack at the [hospital employee], stating that the wait was too long; do you deny saying that?

"A. Yes, that specifically, yes.

"Q. Yes or no—

"A. Yes."

[21] "As a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . [S]ee also Conn. Code Evid. § 4-5 (a). In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . .

"Under the first prong of the test, the evidence must be relevant for a purpose other than showing the defendant's bad character or criminal tendencies. . . . Recognized exceptions to this rule have permitted the introduction of prior misconduct evidence to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. Conn. Code Evid. § 4-5 [c]." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Gerald A.*, 183 Conn. App. 82, 106–107, 191 A.3d 1003, cert. denied, 330 Conn. 914, 193 A.3d 1210 (2018); see also *State* v. *Campbell*, 328 Conn. 444, 517–18, 180 A.3d 882 (2018).

[22] "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible

on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . This rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn. 469, 479, 72 A.3d 48 (2013); see also C. Tait & E. Prescott, supra, § 1.32.3, p. 101.

[23] After the defendant admitted that he went to the hospital on March 22, 2014, the following colloquy occurred between the prosecutor and the defendant:

"Q. Okay. And that while you were there, you were swearing and threw your bloody ice pack at the hospital personnel, stating the wait was too long; did you say that, yes or no?

"A. No.

"Q. You deny saying that?

"A. Correct. . . .

"Q. Are you denying that the following occurred, that you left without being seen; you deny that occurred, sir?

"A. No.

"Q. Did you deny that you swore and threw your bloody ice pack . . . stating that the wait was too long; do you deny saying that?

"A. Yes, that specifically, yes."

[24] On appeal, the defendant raised, for the first time, a claim that his text messages "were totally irrelevant to the tampering and intimidating charges." The state correctly asserts that this evidentiary claim is unpreserved and thus unreviewable by this court. See *State* v. *Jorge P.*, 308 Conn. 740, 747, 66 A.3d 869 (2013); *State* v. *Gonzalez*, 272 Conn. 515, 539–40, 864 A.2d 847 (2005). Accordingly, we decline to consider this claim.

[25] Specifically, the court noted: "[The jury] just heard this defendant curse at length and repeatedly in this statement to the police. So, if he's willing to use the word—the F word—repeatedly in front of the police, the fact that he uses foul language to communicate with his girlfriend . . . all of these messages are in context. He's trying to intimidate her, threaten her, and get her to change her testimony, and, even though the messages are crude, it's an attempt to get the witness to turn against her family and to support him. . . . And yes, while it is prejudicial in terms of the language that [he] uses, it's not any language that [the jurors] haven't heard from this defendant, certainly, in his own words on [the audio recording of his police interview]."

[26] Our Supreme Court has noted that "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Bryant*, 233 Conn. 1, 9, 658 A.2d 89 (1995).

[27] General Statutes § 53a-19 (c) provides in relevant part: "[A] person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ."

[28] See General Statutes § 53a-19 (b) (1).

[29] Photographs of these "rocks" or "boulders" were admitted into evidence.

[30] Although accident and self-defense are separate and inherently inconsistent claims, our law recognizes the ability of a defendant to raise them as alternative theories. See, e.g., *State* v. *Singleton*, 292 Conn. 734, 753 n.14, 974 A.2d 679 (2009).

[31] The court's reference to Griffin's testimony appears to be mistaken. Griffin testified that he was with the victim during the evening hours of August 9, 2014. He also stated that approximately thirty minutes before the fatality, he had been talking to a woman while walking to the victim's home. At this point, he observed the Avalanche as it proceeded past a stop sign

without stopping and with the headlights turned off. This incident occurred at the intersection of Arctic Street and William Street. Griffin also indicated that the victim was not with him at this time.

It was Shuler who testified that he was with the victim on the night of August 9, 2014, in the area of Arctic Street and William Street. At that time and location, he stated that he was with the victim and Griffin when the defendant "hit the gas and swerved towards" the group of three, causing them to jump onto the sidewalk.

[32] The court's statement actually refers to the testimony of Shuler, and not Griffin. See footnote 31 of this opinion.

[33] Specifically, the court instructed the jury: "In addition, the state can defeat the defendant's claim of self-defense by proving one of the statutory disqualifications of self-defense. The statute defining self-defense describes certain circumstances in which a person is not justified in using any degree of physical force in self-defense against another.

"One, provocation, § 53a-19 (c) (1). One such circumstance under which a person is not justified in using any degree of physical force in self-defense against another is when he provokes the other person to use physical force against him. In order to provoke the use of physical force by another, it is not enough that the defendant, by his conduct, elicited the use of physical force by another. Rather, the defendant must mis—rather, the defendant must have embarked upon such conduct with such—with the specific intent to provoke the other into using physical force and intending to cause the other physical injury or death.

"The defendant must have specifically intended to provoke another into using physical force, and then used force to defend himself from the ensuing use of force by the person provoked. It is important to remember that the defendant has no burden to prove that he did not provoke [the victim] into using physical force against him. To the contrary, you may only reject his defense on the basis of this—this statutory disqualification, if you find that the state has proved beyond a reasonable doubt that the defendant provoked the use of physical force by [the victim] against him.

"Two, initial aggressor. Another circumstance under which a person is not justified in using any degree of physical force in self-defense against another is when he is the initial aggressor in the encounter with another person, and he does not both withdraw from the encounter and effectively communicate his intent to do so before using the physical force at issue in the case. Under this provision, the state can prove that the defendant was not justified in using physical force in self-defense by proving beyond a reasonable doubt that he was the initial aggressor in his encounter with [the victim]. And that he neither withdrew from that encounter, nor effectively communicated his intent to do so before using physical force against [the victim].

"To prove that the defendant was the initial aggressor in his encounter with [the victim], the state need not prove that the defendant was the first person to use physical force in that encounter. The initial aggressor can be the first person who threatened to use physical force or even the first person who appeared to threaten the imminent use of physical force under [the] circumstances.

"It is important to remember that the defendant has no burden to prove that he was not the initial aggressor or that he withdrew from the encounter and communicated his intent to do so before he used physical force against [the victim]. To the contrary, you may only reject his defense on the basis of this—this—this statutory disqualification, if you find that the state had proved beyond a reasonable doubt that the defendant was the initial aggressor, did not withdraw from the encounter, and did not withdraw from the encounter, and did not communicate his intent to withdraw before using physical force."

[34] The court instructed the jury: "Exception to [the] use of deadly physical force, duty to retreat. In addition, the state can defeat the defendant's claim of self-defense by proving a statutory disqualification to the use of deadly physical force. The statute defining self-defense describes a circumstances in which a person is not justified in using deadly physical force in self-defense of another. So, if you have found the defendant used deadly physical force, you must consider this exception.

"Duty to retreat, § 53a-19 (b) (1). A person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety by retreating. This disqualification requires a defendant to retreat instead of using deadly physical force whenever two conditions are met. One, a complete safe retreat is, in

fact, available to him, and, two, he knows that he can avoid the necessity of using deadly physical force by making that completely safe retreat. The law stresses that self-defense cannot be retaliatory; it must be defensive and not punitive.

"The term complete safety, as used in this statute, means without any injury to the defendant whatsoever. A person acts knowingly with respect to a circumstance described in a statute when he is aware that such circumstance exists. A person acts knowingly with respect to a circumstance when he is aware that it exists. Ordinarily, knowledge can be established only through an inference from other proven facts and circumstances. *The inference may be drawn if the circumstances are such that a reasonable person of honest intention in the situation of the defendant would have concluded that one could avoid the necessity of using deadly physical force by making that completely safe retreat.*

"The determinative question is whether the circumstances in the particular case form a basis for the sound inferences as to the knowledge of the defendant in the circumstances under inquiry. It is important to remember that the defendant has no burden whatsoever to prove that he could not have retreated with complete safety or he didn't know that a safe retreat was possible before he used physical force against [the victim]. To the contrary, you may only reject his defense on the basis of this statutory disqualification if you find that the state has proved beyond a reasonable doubt that he did know that he could retreat with complete safety. . . .

"[Y]ou must find that the defendant did not act in self-defense if you find that the state has proved beyond a reasonable doubt that, now I'm going to cover the exceptions, one, the defendant provoked [the victim] into using physical force against him, or, two, the defendant was the initial aggressor in the encounter, or, three, the defendant had a duty to retreat from the physical encounter because he knew he could do so with complete safety." (Emphasis added.)

[35] General Statutes § 53a-19 (b) provides in relevant part that "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating . . . ."

[36] The state argues that the defendant's claim as to the provocation instruction is not reviewable because his defense counsel remained silent when the court stated that he had abandoned the challenge to that specific instruction. In support, the state directs us to *State* v. *McCall*, 62 Conn. App. 161, 166B, 780 A.2d 134, cert. denied, 258 Conn. 935, 785 A.2d 231 (2001), where defense counsel agreed with the court's ruling on a motion in limine regarding the defendant's prior misconduct. We declined to consider the appellate claim that the court had improperly denied that motion, noting that "[a]ppellate courts do not review rulings that the defendant accepted or requested at trial . . . ." (Internal quotation marks omitted.) Id.

In the present case, defense counsel did not expressly agree with the court's statement that he had abandoned the objection to the provocation instruction. Additionally, as noted in his reply brief, the defendant challenged the provocation instruction in his postverdict motion for a new trial, and the court addressed it. Under these facts and circumstances, we conclude that this claim is reviewable.

[37] Specifically, the court instructed the jury: "A person is not justified in using deadly physical force upon another person *if he knows* that he can avoid the necessity of using such force with complete safety by retreating. This disqualification requires a defendant to retreat instead of using deadly physical force whenever two conditions are met. One, a completely safe retreat is, in fact, available to him and, two, *he knows that he can avoid the necessity of using deadly physical force by making that completely safe retreat.* . . . A person acts knowingly with respect to a circumstance described in a statute when is aware that such circumstance exists. A person acts knowingly with respect to a circumstance when he is aware that it exists." (Emphasis added.)

[38] Specifically, the court instructed the jury: "Ordinarily, knowledge can be established only through an inference from other proven facts and circumstances. The inference may be drawn if the circumstances are such that *a reasonable person of honest intention in the situation of the defendant would have concluded that one could avoid the necessity of using deadly physical force by making that completely safe retreat.*" (Emphasis added.)

[39] Specifically, our Supreme Court explained: "The defendant's evidence concerning the stabbing consisted solely of his own testimony and was factually inconsistent with an instruction regarding the duty to retreat.

According to the defendant, the victim jumped on top of him without warning and began strangling him. The defendant testified that he attempted, unsuccessfully, to free himself by removing the victim's hands from his throat prior to using the pocketknife. Given this factual scenario, the jury reasonably could not have determined that there existed any opportunity for the defendant to retreat safely prior to using force." *State* v. *Whitford*, supra, 260 Conn. 625–26.

[40] Specifically, our Supreme Court stated: "The state, choosing affirmatively to advocate for the victim's version of events, presented no evidence tending directly to defeat the claim of self-defense. The state's case was thus presented largely through the testimony of the victim, who maintained that the defendant, unprovoked, assaulted and stabbed him in his bedroom. This factual scenario, however, does not even raise the issue of whether the defendant was justified in using force. It therefore cannot form the basis of an instruction on an exception to the claim of self-defense." *State* v. *Whitford*, supra, 260 Conn. 626.

———————————————————